23-1293 and 23-2627, Western Missouri, Associated Electric Cooperative, v. Southwest Power Pool All right, good morning. Mr. Friedman, we'll hear from you first. Good morning, may it please the court. Larry Friedman on behalf of the appellant, Associated Electric Cooperative, and I want to start by addressing a question Chief Judge Colleton raised about why couldn't Associated have said no, and the fact that they didn't, what's the effect of that? It's important to keep in mind, yes, Associated said yes, but Associated said yes after it was told by SPP. We are not asking you to do anything that will be detrimental. That's one of the facts we've pleaded, and that's an important fact to keep in mind, the context of this emergency, and that's going to be a running theme in everything I say. I'll start by saying I have the unenviable task of explaining why the district court was correct in No. 23-2627, and why it was incorrect in 23-1293. There's in fact a through line there. The district court correctly applied basic principles of contract law when it correctly ruled that SPP was not entitled to its attorney's fees. The district court did not look at those issues with respect to our causes of action, the Associated Electric's complaint. It declined to even consider those because it believed that it was foreclosed from doing so because FERC exercised primary jurisdiction. That was error, and it deprived Associated of its right to pursue its legal and equitable remedies to recover the $29 million in unreimbursed costs that Associated incurred when Associated supplied power to SPP on an emergency basis at SPP's request. As I said, Associated did that only after SPP said we are not asking to do anything detrimental to Associated financially or liability-wise. That's a key factor to keep in mind. Associated is a non-for-profit entity. Its member owners are rural generation and transmission cooperatives. They supply wholesale power to 51 distribution cooperatives in three states. It would be profoundly inequitable if under the circumstances of this case, Associated's rural member owners were forced to subsidize SPP's members in the amount of $29 million. These circumstances are a textbook example of why unjust enrichment, restitution and action under Missouri law, even if there arguably is a written contract, here by analogy that contract would be the tariff. The district court did not even analyze the viability of those claims, and SPP does not address them in its brief. Instead, the district court said, and now I'm quoting from the order, because FERC has primary jurisdiction, I'm going to point. That was error for several reasons. First, FERC did not have primary jurisdiction for the reasons you heard in the prior argument presented by Ms. Allen. But even if FERC did have primary jurisdiction, the district court was still required to conduct its own analysis of whether Associated could assert all of its claims, the oral contract as well as what I'll call the equitable claims. What the district court did was give race to FERC's legal conclusions. And that is error. That is not the purpose or import of primary jurisdiction. Mr. Friedman, let me ask this. If the petitions for review are denied in this court from the prior case, doesn't this lawsuit effectively become an impermissible collateral attack on the FERC decision? No, Your Honor. And that's because, again, in the circumstances of this case, you have a situation where I mean, the arguments are essentially the same as what was before FERC, right? Respectfully, no. I don't believe they are the same because what FERC specifically said, we are not exercising primary jurisdiction over Associated's, what they call its court claims, what I'll call its equitable claims. FERC specifically said we are not exercising primary jurisdiction over those claims. We're expressing no view on them. We have no expertise on those subjects. And so you're left with the issue for the district court, in these circumstances, would it be inequitable to deprive Associate Electric of the opportunity to seek restitution? And we've cited Missouri cases where Missouri courts have said, first of all, Missouri courts clearly recognize the viability of restitution of, excuse me, restatement of restitution, section 115, which authorizes a restitution in a situation like this. SVP doesn't deny that, and the district court didn't discuss it. But if FERC's right, and we deny the petition, you're not entitled to restitution, are you? Is there any argument that you'd be entitled to restitution? Yes, there is an argument, Your Honor, and that would be for the trier of fact to decide. The trier of fact would look at these circumstances, and this is what we were deprived of the opportunity of doing. The trier of fact, again, you assume everything we say in our complaint is true, the well-pleaded facts, and the well-pleaded facts are this was an emergency, they asked us, they said you're not going to do anything, we're not asking you to do anything detrimental financially to the point of, you know, whether it would say yes or no, this was literally a life and death situation. We're talking about hospital emergency rooms that are going to not have power. We're talking about people who are going to die if they don't get power before there's time to do this, what we're calling the paperwork, not to trivialize it. And so you have a restatement section 115, which says that, it's called the Emergency Assistance Doctrine, and it says a person who performs the duty of another by supplying things or services is entitled to restitution from the other if the things or services were to satisfy the requirements of public decency, health, or safety. Now there's no, that right applies as an equitable matter, even if there were a contract, and there's, SVP has cited no authority, no one has cited any authority that says that does not apply in a situation where there happens to be a filed rape. And that's our situation, and we have an analogous case. Do you have any authority on the flip side? Well, yes. It's the Consolidated Edison case. That's the most analogous one. That's from the Second Circuit, but it specifically applied restatement section 115. There was literally no mention of restatement section 115 in SVP's brief. After FERC determined that there was a tariff on file that was on point. I said it was analogous, Your Honor. There wasn't a FERC issue there, but there was an argument that, well, we had an agreement, and this, you know, all we had was some phone calls here, and there was an argument that we never, you know, we never agreed to pay you that. And the District Court, as affirmed by the Second Circuit, said, well, in these circumstances, given, and they quoted the restatement, and they specifically talked about, there the power plant had gone, one of Consolidated Edison's power plants had been in an emergency situation, and the parties had phone calls, and in that case it was the Atomic Energy Commission, supplied the power on an emergency basis, and then said, well, we need to recover our costs. And Con Ed said, well, no, we never agreed to that. And the court said, well, the emergency assistance doctrine applies in this situation because we're talking about electric power and the immediate public safety issues here. So, you know, has this fact pattern come up before? No, it has not. But the question for today is, have we stated a cause of action? This was a 12B6 dismissal. If you assume everything we say is true, we should have the right to present those factors to the trier of fact, and the trier of fact can hear SDP's side of it, and can hear our side of it, and decide if it's inequitable. There was a reference in one of the questions about whether there's a dispute about whether our additional costs are $29 million over and above what they've paid us, and that's really not in the record of the district court because it was a 12B6 dismissal, but those issues would be decided in discovery as, you know, any other claim. But the key point is, do we have a cause of action, even if, under your scenario, Judge Grunder, even if you find there was a fouled rate, there's no issue that the $29 million they paid us is the amount that you would receive under, for the LMP portion that's in the tariff. There's no issue about that. But the issue is, in these circumstances, is it inequitable to be bound just by analogy of the contract, and there's clearly Missouri authority that says, and we've cited several examples, the Banfield case is one, Petrie case is another, where the court said, understand this contract, but there is still an equitable right to recover in these circumstances, notwithstanding that there is a contract. So for these reasons, we believe the district court's decision to dismiss AECI's complaint should be reversed. The case should be remanded with instructions to deny that motion and dismiss, and let the case proceed, and let the trier of fact decide whether it's equitable or not. I'll reserve the rest of my time, unless the panel has any more questions at this time. Very well. You may reserve. Mr. Henry, we'll hear from you. Well, good morning, Judge, Chief Judge Colleton, and thank you for your service, Judge Malloy. My name is Mark Henry. Thank you for your service. I represent SPP, and not to forget you, Judge Grinder. Thank you for your service. I represent SPP, and I've been in, I've watched, I was the trial counsel at this level. Although it was dismissed, I want you to know that there was a scheduling order, and we conducted tremendous amounts of discovery in the case, and so I'm itching, you might see this in my expression, to say, of course we dismiss it, but it is not part of the record, and I will have to accept their well-pleaded complaint rule, and I understand that. So if you see me anxious, that's why, because we do vigorously disagree with that. But I want to start, Chief Judge, by addressing something squarely that you came up in your previous questions on both appeals. You asked, well, why could they not have said no? And that is, that's an important thing, and I'm surprised that my co-counsel hasn't drawn your attention to the fact that they could not have said no. AECI could not have said no, and I will direct your attention to Joint Appendix 128. That's the joint operating agreement between SPP and AECI that had been on file for a very long time and approved. That's what these parties who have literally transacted hundreds and hundreds of energy transactions were looking at, and I will call your attention to 6.1.1. The caption of this article is, Principles Concerning Joint Operations in Emergencies. Okay? Under 6.1 is emergency operating principles. And I'll read, take my glasses off, it says, in the event a party declares an emergency condition in accordance with its published operating protocols, the party shall coordinate respective actions to provide immediate relief until the declaring party eliminates the declaration of emergency. So here we have a situation where the parties have worked together for a very long time under specifically negotiated terms, wherein the term says, in the event of an emergency, we shall work together. We're in it together, we shall work together. Well, how does this help you? I thought that... It doesn't. I'm not saying it... Ms. Allen said, well, we could have said no. That's where I got started on this. Right, but the purpose of me being before you as a panel is to provide you with the information. It doesn't help me, but what it does show and make the point is, these parties could have long ago recognized what their obligations were, and they did, and they put it to writing, and it was approved by FERC. This JOA does not provide an enhancement to the compensation for that emergency energy. Now, subsequent to that event, these parties did enter into a different agreement that does allow a separate enhancement calculation for emergency energy provided. Under this JOA that's applicable to this situation, however, the default LMP applies. Now, let me call your... That's meaningful, because you say, well, couldn't they have said no? They couldn't have, because they negotiated a situation where they wouldn't say no. Why? Because the end user consumers, that's what the Federal Power Act is all about, to protect those people. So your point is, having agreed to do that long ago, they should have asked for a contingency in the agreement to provide for make whole relief or whatever they wanted. I'm not blaming them, Serge. Chief, I'm not blaming them, but I'm not letting a clear error escape your understanding, a miscommunication. I take no fault with my colleague. What I'm saying is, you need to know exactly how these parties operated for many years, and that they could have, because the market participation agreement allowed them to. All of this is part of the tariff. This is not a situation where SPP, out of the blue, calls up AECI and says, oh, we are in dire emergency. That's not the situation where first-time call, we don't know you. This is a relationship built for 20 years on terms that are clear and expressed, and we assume everybody on both sides understands what these terms are. So, how does that relate to the payment? We all know it's an LMP. Taking their complaint as true, at paragraph 22 of their complaint, they clearly state, at the same time SPP wanted energy from us, we were buying it from them. They were both looking at the same interface for the LMP price at that time, so they knew what that was. Now, this is where I want to talk to you about the depositions I took. I won't, about what they really thought the price was. What you have in the record is, at the same time they were wanting to sell to us, they were buying from us, so they knew the price. Because I wanted, I was so urgent to correct that error, Judge. I appreciate that. Why don't you talk about this Missouri law question, if you would. Mr. Friedman says, you know, in an emergency situation, Missouri law allows for a court to order relief beyond the contract, even if the filed rate is a contract here. What do you say to that? I would say filed rate is the law. It's not just a law, it is the law for the federal government, and it sets the rate. So, okay Missouri, as I understood Mr. Friedman's argument, he wants a two-step process where by the first step he gets all of the LMP, all of that payment that he was due under the tariff, and then they want to do these state law cobbled together claims and say, we want all these other things too. Well, Judge Wyams put that to rest. Judge Wyams clearly stated in his order, and we urge you to accept that as well, that both Arkansas and Missouri say that when their express contract governs, equitable claims dissipate. That is the difference between making a claim in a pleading style, you can plead however you wish, but once it's been determined a contract, an express contract does exist, those go away. I think there's some confusion in the briefing as between the parties about whether or not SPP urges it is impossible to plead equitable claims in the face of a contract. We don't say that's impossible. You may plead it, and Judge Wyams even acknowledged that, but once a contract is at place here, clearly determined by FERC and also reviewed by Judge Wyams, those dissipate under a 12B6 dismissal. There is no more relief you can get. My colleague wants to put all this in front of a jury, but you still have to have a legal mechanism to present such facts in a framework where relief could be granted. In fact, if I can read from Judge Wyams' opinion, this is the appendix at 857. He states, the court, having independently reviewed the record, agrees with FERC's analysis and finds the rate to be paid for the emergency energy is that of other import interchange transactions because no other rate was contemplated by the JOA. Again, the JOA was in existence between these parties since 2008. A decision today respecting the final great doctrine, respectfully, applies not only to the energy industry, but it applies to many other areas too, such as the telecommunications industry, railway, transportation, and natural gas. This is the benefit of the rate payers when we look at this in a larger picture. Before we get on any other detail, I want to reiterate, this is your opportunity to address the standard of review. Judge Malloy, you asked in a previous hearing on the FERC matter what the standard of review is. I want to pleasantly say that Mr. Friedman and I agree that the case on point is Halsey v. Townsend Corp. That's a 20F41222. That's a 2021 8th Circuit decision. This court has not made a determination of what the standard of review or the proper standard of review when applying the primary jurisdiction by FERC by a trial judge. Here you are in the unique position of seeing both sides. You get to see FERC's attorney in the argument before and FERC's analysis in the argument before. Because this is both assigned to your case, you can have confidence you're in a unique position to determine whether or not de novo is the proper standard of review. Perhaps you mistrust the government's analysis, not you, but generally as an approach. Or you can say whether or not an abuse of discretion standard is the proper. So I invite you to do that with this case. Previously in Halsey, you stated, the 8th Circuit stated, we'll wait to reserve judgment on which standard of review to see when a case properly challenges it. In the previous cases where a de novo standard of review was applied. What standard are you urging? Well, of course, an abuse of discretion standard, Judge. Why? Because it meets the three factors relative to... First, it's the prevailing view. There are only two circuits right now that are adopting the de novo standard of review. You would be joining with the majority of other circuits to adopt the abuse of discretion view. Second, a de novo review comports with the... Well, I'm sorry. An abuse of discretion standard comports with the main purpose of allowing specialized bodies to make these kinds of decisions. And third, the primary purpose of the primary jurisdiction doctrine is to resolve situations where a claim is cognizable in the courts, but enforcement requires resolution of issues involving a regulatory scheme. So it's not determinative. I believe that even under a de novo standard review here, you would find that the FERC commission did an excellent job in a well-reasoned analysis of establishing what AECI was able to present, what they were able to argue, and then come up with a conclusion that the final great law is the law of the land. I understand we have these equitable claims that only the district court can rule upon and that FERC said we're not going to address those. But what's the purpose of the district court's independent review of the file rate doctrine when it's already agreed that FERC has primary jurisdiction? And at the end of the day, does it really make any difference whether they apply race judicata or some other standard? Because either FERC is wrong. If FERC is wrong, the district court's wrong. And if FERC is right, I presume the district court's right. I can't envision a situation where we'd say FERC got it right, but district court, you got it wrong on file rate. Judge Malloy, that's exactly what I wanted to say as an opening statement, frankly, because you're right. It's a filed rate or it's not. It truly is. If FERC is just dead wrong and companies are allowed to make side agreements on the price of energy and the filed rate doesn't apply, okay, you're right. Then we'll go to trial and we'll dispute those issues on the calculation of damages and whether or not there could be a $58 million oral contract. We can deal with those at trial if the case proceeds. But on the face of the complaint, we didn't even file an answer. Right? On the face of the complaint, there is still the filed rate is staring everyone down the barrel. So you're right, Judge Malloy. It doesn't matter. The equitable claims fall away. We are prohibited. Well, I'm not talking about the equitable claims. I understand those are different and only the district court, I shouldn't say adjudicated, only the district court ruled on the motion to dismiss those equitable claims. Yes. So there's nothing about that in the prior appeal of the FERC decision. Correct? Correct. And to your other point about whether or not you have to reach the decision of race judicata in order to agree. You don't. We briefed to show you how this is so on point that AECI had all available remedies and arguments and was there and all the aspects of race judicata do apply, but that's not why the judge made the decision he made. I thought the argument here was that the normal rule that equitable claims are unavailable when there is a contract does not apply here because there's some kind of exception for emergencies under Missouri law. Do you have a, did I miss, I thought that was the argument from the appellant. That was his argument today. Do you have a view on that? That again, back to the filed rate. I don't know a Missouri emergency clause would somehow supersede the federal law of the tariff and permit side agreements, which in fact it would be doing, permit state by state side agreements for the transmission of interstate power. Missouri, Arkansas, the power was transmitted and it's fully governed by the federal. You think it's a preemption situation? Or are you saying it's a matter of state law? I think it's clearly a preemption issue as well, although this seems new to me from my colleague and I don't mean to be critical of my colleague. He's excellent. He's wonderful to work with in the trial. I mean no disrespect at all. And there's a cross appeal, but I'm out of time. Very well. Well, thank you for your argument. And again, thank you judges for your time. All right. Mr. Friedman, we'll hear rebuttal. A few points I'd like to respond to raised by my colleague, Mr. Henry. No particular order. One of the things he said was, well, these parties have this longstanding practice, but that was not the situation here. This situation literally had never arisen before. And again, you don't need to take my word for it. It's in the record. SPP had said this had never happened in our 80-year history. So this was an unprecedented situation. This was not a normal. And you can see that from our complaint quotes from the oral discussions. You can certainly hear it when you listen to them in the urgency and the voices. This clearly was an emergency, not the normal transaction. That section of the joint operating agreement that Mr. Henry pointed to does not address pricing. It literally says operating agreement, and it talks about operations. So when they're talking about emergencies there, they're talking about the mechanics of, you know, what do we do if a power line is down? We're going to cooperate on that, things like that. But there is nothing in the joint operating agreement that talks about pricing of emergency energy and nothing that says that the LNP is going to be the default price in the event of an emergency. It was simply a scenario, literally unprecedented in 80 years, that the parties did not address in that agreement. And that is where equity steps in. It doesn't happen very often. When it does, that's why we have these equitable claims. That's the whole purpose of them, and that's what the Missouri case law that we've cited talks about. Mr. Henry suggested that we hadn't raised this issue before. We talk about restatement section 115 in our brief. I think it starts at page 63. We also talk about it in our reply brief, and there's literally no mention of that doctrine in SBP's brief or why that doesn't apply, nor did the district court discuss that. So Mr. Henry, I forget what they call it. In rhetoric, there's a term where a speaker says, I'm not going to talk about X. I'm not going to talk about how Judge Malloy had such a long, distinguished career. I'm not going to talk about that. Well, I just did, obviously. He tried to do that with saying, well, there was discovery. It's not on the record where they said there was discovery about where we dispute that the $29 million is their excess costs. It's not on the record, so we don't need to get into that. So I'm not going to talk about the fact that there's also Well, you've both talked about it now. I think we can leave it at that. Do you have anything to add about this question, whether Missouri really allows for some kind of emergency exception to the normal rule that when there's a contract, no equitable claims are available? Was that argued before? Yes, and we cited, as I said, the Banfield case, the Petrie case. I think there's cases in our brief where the Missouri court said, okay, we understand there's a contract here. I think in Petrie, it was a sale of real estate. In Banfield, it was an easement, a written easement. And the court said, okay, we understand there's a written agreement here, but the equities of this situation require us to at least let the plaintiff pursue the claim that it would be inequitable in these specific circumstances. So it's very much a facts and circumstances specific analysis. They rely on Section 115. Missouri does recognize Section 115. We've cited the city of St. Louis tobacco case that we cited and what happened in that case on remand. And the most analogous factual situation where court recognized that this doctrine of restitution applies when you're talking about electric power because of the effect it's going to have on public safety if it's not provided immediately, that section applies, and that's our situation here. So there's abundant authority for our position, Your Honor. Very well. Thank you for your argument. Thank you to both counsel. The case is submitted. Thank you, Your Honor. The cases are submitted, and the court will file a decision in due course. Counsel are excused. The court will be in recess.